1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

ALBERTO J. GARCIA,

             Petitioner,

   v.

FRED FOULK, Warden,

             Respondent.

No. C 13-05237 BLF (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

17       Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas
18  corpus pursuant to 28 U.S.C. § 2254.[1]  The Court ordered Respondent to show cause why
19  the petition should not be granted.  Respondent filed an answer addressing the merits of
20  the petition and Petitioner filed a traverse.  Having reviewed the briefs and the underlying
21  record, the Court concludes that Petitioner is not entitled to relief based on the claims
22  presented and denies the petition.

### PROCEDURAL HISTORY

24       Petitioner was charged with one count of murder and a special allegation that he
25  personally used and intentionally discharged a firearm causing great bodily injury and
26  death.  (Ans., Ex. 1 ("CT") at 154.)  On March 4, 2009, a jury in Contra Costa County

27
28

---

[1]This matter was reassigned to this Court on April 17, 2014.

Order Denying Petition for Writ of Habeas Corpus; Denying COA
G:\PRO-SE\BLF\HC.13\05237Garcia_deny_HC.wpd

1  Superior Court found Petitioner guilty of first degree murder and found him not guilty of

2  the special allegation. (*Id.* at 653, 656.) On September 18, 2009, the trial court sentenced

3  Petitioner to 25 years to life in state prison. (*Id.* at 725–26.)

4       Petitioner appealed to the California Court of Appeal, which affirmed the

5  conviction in a reasoned judgment on August 31, 2012. (Ans., Ex. 8 *hereinafter* "Op.")

6  On November 14, 2012, the California Supreme Court summarily denied a petition for

7  direct review. (Ans., Ex. 10.) On November 12, 2013, Petitioner filed the instant federal

8  habeas petition.

9  **BACKGROUND**[2]

10     In an information, defendant was charged with the July 21, 2007, murder
   of David James Watson. It was additionally alleged that during the murder

11 defendant personally used and intentionally discharged a firearm causing
   great bodily injury and death to Watson. The following relevant evidence

12 was presented at a jury trial held in February and March of 2009.

13 A. Prosecution's Case
   The prosecution's theory of the case was that defendant, his friend

14 Joaquin Agredano, and Agredano's mother, Barbara Washburn, were
   involved in the murder of Watson. Washburn, deemed an accomplice as a

15 matter of law, testified as to the circumstances leading to the murder. In
   July 2007, Washburn was living in a second-floor apartment with the

16 victim whom she described as her boyfriend. Her son had visited the
   apartment but he was not staying there at the time of the murder.

17 Washburn had known defendant for a few months. Defendant was a friend
   of her son and the victim. Washburn owned a blue Ford pickup truck with

18 a camper shell on the back. The truck had one bench seat for the driver
   and passengers.

19
   On the evening before the murder, Washburn and her son picked up

20 defendant in her truck to take him to a house in Concord. During the
   drive, Washburn said she was moving out of the victim's apartment. She

21 was upset with the victim and complained about him as she had done on
   other occasions to her son. Defendant was saying things like he did not

22 like the victim too much, and he was getting mad at the whole situation.
   Defendant said he needed to talk to the victim because he did not like

23 what was going on. Washburn told defendant not to worry about the
   situation

24
   Once in Concord, Washburn and Agredano remained in the truck.

25 Defendant left and later returned with a duffle bag. Defendant did not care
   where he was dropped off. All three then went to a San Francisco bar and

26 stayed there until closing. Washburn wanted to stay in San Francisco, but

27 _____

28     [2]The facts of this case are taken from the California Court of Appeal opinion in *People v. Garcia*, No. A126353 (Cal. Ct. App. Aug. 31, 2012). (Ans., Ex. 8.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

defendant wanted to go back to Pittsburgh to see the victim. During the ride over the Bay Bridge, defendant fired a gun outside the truck window. When Washburn asked defendant what he was doing, defendant just laughed; he thought it was funny. Both Washburn and her son asked defendant to put the gun away and he placed it in his duffle bag. Washburn thought the gun could have been a sawed-off shotgun, but she was not sure. [FN 1] When Washburn passed the highway exit for the victim's apartment, defendant got very upset and demanded to be taken to the victim's house. Washburn stopped the car and Agredano got into the driver's seat and drove to the victim's apartment.

> [FN 1] The prosecution's firearms expert testified he did not know what type of shotgun was used to kill the victim.

At the victim's apartment, Washburn remained in the truck and defendant and Agredano got out of the truck. Agredano stood at the side of the truck, while defendant walked upstairs to the victim's apartment. Defendant had his bag with him. Washburn yelled at her son to get defendant, saying "Let's go. He got that bag." Agredano walked to the bottom of the stairs, and yelled, "Let's go." Washburn moved into the driver's seat and started the truck. When no one answered the victim's door, defendant came down the stairs and he and Agredano started to walk towards the truck. All of a sudden, defendant turned back and Agredano stopped as well. Washburn yelled, "Let's go. I'm leaving." She drove a short distance and then turned around so that the men would believe she was actually leaving. During the time she was driving the truck she could not see her son and did not know if he went upstairs to the victim's apartment. As she was driving back towards the victim's apartment, Washburn heard a bang and then a gun go off about three times. Before the gunshots, she heard the victim say, "Hey," and after the shots, the victim again said, "Hey," and then faded away. When she heard the shots, Washburn screamed loudly because she heard the victim's voice fade away and knew he was hurt. Washburn saw defendant running downstairs; her son was already at street level. Defendant had a gun in his hands but Washburn did not see defendant's bag. The front door of the victim's apartment was wide open. Agredano got into the truck's driver's seat, Washburn moved to the middle, and defendant got into the passenger seat. Agredano told his mother to stop screaming, and she did so. Defendant was laughing and asked Washburn if she had heard what the victim sounded like, or something to that effect.

After leaving the victim's home, Agredano drove the truck to a gas station in Antioch. On the way to the gas station, defendant used his cell phone to call a number of people. He called a woman named Dorry, and asked if he could stay with her. Dorry refused to allow defendant to come to her house. Defendant also called his mother in Reno more than once. Defendant and Washburn took turns driving the truck to Reno. Once in Reno, defendant went to his mother's home, taking the gun with him. Defendant said, "I have to go hide this from my mother." Defendant, Washburn, and Agredano then went to a nearby coffee shop, and Washburn later drove defendant back to his mother's home. Washburn and Agredano then returned to California.

Washburn did not report the incident to the police because she was "basically scared for [her] life." Washburn and her son went to a cousin's home in San Francisco. They stayed a few days and then returned to

1   Contra Costa County in Washburn's truck. The Contra Costa County
2   police stopped Washburn's truck. Washburn surrendered to the police, but
    Agredano took off in the truck. Agredano was later apprehended, and after
3   a brief struggle, he was arrested by the police.

4   When Washburn initially spoke with the police, she lied and said she was
    not at the victim's apartment at the time of the killing. She lied because
5   she was scared of "[t]he whole situation. It was just crazy." She was afraid
    for herself and her son because she did not know what defendant would
6   do. After the police said Washburn and her son were under arrest for
    murder, and that what she told them next would make the difference
7   between whether she and her son went home or went to jail, Washburn
    changed her story and gave the police more details about the incident. The
8   jury was also informed that if Washburn testified truthfully and fully she
    would be allowed to plead to the crime of felony accessory to murder and
9   would receive a probationary term after having served about three months
    in jail.

10  Felix Makinano testified that in July 2007, defendant came to his house
    with another man. [FN 2] After defendant and the man left the apartment,
11  defendant returned alone and asked Makinano to keep a bag for him.
    Makinano agreed, and put the bag, "a green avocado color chair holder
12  with a ... pull string," inside a closet. Before securing the bag, Makinano
    looked inside and saw "a black shotgun." Makinano did not examine the
13  gun to see if it was loaded. A couple of days later, at about 10 p.m.,
    defendant retrieved the shotgun from Makinano's home. At that time
14  defendant arrived in a pickup truck with a camper shell. There were two
    people in the truck, one male and one female. Makinano did not recognize
15  the woman. The man was the same man that had come to Makinano's
    house when defendant had earlier dropped off the shotgun. The jury was
16  also informed that at the time of his trial testimony Makinano was on
    felony probation, and he had been convicted of robbery in 1992 and
17  felony grand theft in 1995. [FN 3]

18      [FN 2] Makinano later identified a photograph of Agredano as
        looking like the man who came with defendant.
19
        [FN 3] The prosecutor also proffered evidence that in June 2007,
20      Agredano had been seen in possession of a "camouflage" shotgun
        as he left the home of Andy Dryer. A month later, on or about July
21      15, 2007, Dryer discovered his shotgun was missing after a
        burglary at his home. Unlike the guns described by Washburn and
22      Makinano, Dryer described his missing gun as an unloaded,
        full–size, "semi–automatic" "12–gauge Browning Silver
23      camouflage [greens and browns] shotgun with a scope on top of
        it."
24
25  In the early morning hours of July 21, 2007, the police responded to a call
    and found the front door of the victim's apartment had been forced in and
26  the victim was laying on the floor. The victim later died from the loss of
    blood caused by shotgun wounds in his lung and blood vessels. The
27  medical examiner could not determine how far away the shooter was from
    the victim or the order in which the shooter fired into the victim.
28  However, the victim was hit front to back in his chest, left hip area, back
    of left heel and back of left forearm. The medical examiner believed that

Order Denying Petition for Writ of Habeas Corpus; Denying COA
G:\PRO-SE\BLF\HC.13\05237Garcia_deny_HC.wpd                4

there was a defensive wound on the victim's forearm; the wound in the heel was consistent with the victim trying to flee at the time he was shot and would have caused the victim to fall down; and the wounds in the chest and hip area were consistent with the victim being on the ground when those wounds were sustained.

Millive Kinerman and Lawanna Nichols, the victim's downstairs neighbors, testified as to what they heard from inside each of their apartments. Shortly before the killing, Kinerman was in her bedroom, lying down and listening to the radio. She heard someone knocking on the victim's apartment door, and a female repeatedly saying, "'Open the door.'" Kinerman did not recognize the voice but it was possible it was the woman who lived in the victim's apartment. When there was no response, the female went back downstairs and said something like, "Oh, this is a bunch of '[shit].' " Shortly thereafter, Kinerman looked out a window for just a second. She thought she saw a black truck and "a silhouette of a female because of a ponytail." The female was sitting in the truck's passenger seat. Kinerman could not see if anyone else was in the truck. Kinerman went back to listening to the radio and did not pay any attention after she left the window.

Kinerman initially testified she did not hear the truck drive away or return. She later confirmed she told the police that as the truck drove away, she heard the victim outside his apartment saying, "'Chief, Chief.' ... 'I would have opened the door but you had left.'" Kinerman did not think the victim was actually talking to anyone at that time. Kinerman also could not be sure she heard the truck returning. However, maybe five minutes later, Kinerman heard footsteps on the stairs leading to the victim's apartment. The footsteps were two people "simultaneously" going up the stairs, one appeared to be a male and the other a female. She heard both male and female voices saying, "'Open the door.'" The female voice sounded like it could have been the same person that Kinerman had heard earlier. Kinerman then heard a sound that she thought was a kick on the door. After one kick and within a matter of seconds Kinerman heard the sound of "somewhat rapid" gunfire, about four or five gunshots. Kinerman then heard a very loud female scream, which she demonstrated in court. The scream sounded like it came from upstairs from the female who said, "'Open the door.'" Kinerman heard the victim "gasp." She then heard two sets of footsteps running down the stairs. Kinerman called 911. When she next looked out her apartment window, the police were at the scene. Kinerman recalled that the victim's pit bull dogs were howling in the apartment but she never heard them bark.

Nichols testified that before the killing, she was inside her apartment and saw shadows of more than one person going towards a patio area. She also heard someone throwing rocks towards the window of the victim's upstairs apartment. The victim screamed or shouted. Nichols then heard more than one person running upstairs. She also heard her upstairs neighbor say, "Oh, shit," from inside his apartment. He sounded "[i]n shock." Nichols did not know if the victim's apartment door was open. Nichols then heard gunshots. After the gunshots, Nichols heard her upstairs neighbor's dogs barking.

Jessica Dominguez was interviewed by the police on October 23, 2007. At that time she was using a lot of methamphetamine. [FN 4] She had known

defendant since a few weeks before September 19, 2007. At that time he was her boyfriend and she loved him. She told the police she had had discussions with defendant on two separate times. Defendant had told her he was in a lot of trouble, he was going to have to go on the run, and he asked her to join him. Dominquez refused because she was caring for her two children. Defendant eventually told her about the trouble he was in. He said in effect that "they think I'm involved in this killing of a dude." He told her the victim had done something wrong. Defendant and Agredano were driven to the victim's apartment by Agredano's mother, who was dating the victim. Defendant and his friend had "gone actually up to the apartment." They "had knocked on the door and that someone had kicked in the door." Defendant did not say who had kicked in the door. Defendant believed the victim "had gotten up or that he had gotten up to come to the door, something like that." Then "they shot" the victim and left. After the last shot, defendant heard the victim "take his last breath." Defendant did not say why they shot the victim. He just said the victim had "messed up" and he "had to be dealt with 'cause he fucked up.'" Defendant did not say whether both he and his friend had a gun. When Dominquez asked defendant what he meant when he said, "we shot him," he gave her "a look as if [she] should have known what he meant by 'we.'" Dominguez told the police she thought defendant's look meant "that he was the one to—." Defendant never said he shot anyone. Dominquez assumed that was what defendant meant by his look. When asked if she told the police the truth, Dominquez said she told the police whatever she felt would get her out of the interview as quickly as possible. She did not remember if what she said was true or false. However, her testimony in court was the truth. The jury was also informed that Dominquez had a prior conviction for petty theft, and at the time of her trial testimony she was on felony probation, and she had two pending criminal cases, one for a felony and one for a misdemeanor. If she testified truthfully and fully she would be given consideration in her pending cases.

[FN 4] The prosecution proffered evidence that when Detective James Darnell Butler interviewed Dominquez she did not exhibit any signs of being under the influence of methamphetamine. Butler did not ask Dominquez to submit to a blood test because based on his experience she did not appear to be under the influence.

The preliminary hearing testimony of Dorothy Rudkin was read to the jury. On direct examination, Rudkin, also known as Dorry, testified she was defendant's friend and had been the victim's friend. In the early morning hours of July 21, 2007, defendant called her and asked if he could "come kick it with" her. She said, "No." Defendant also said "the cops in Contra Costa County were looking for him." On cross-examination, Rudkin testified that at the time she received defendant's telephone call she was "regularly under the influence of methamphetamine." When she later spoke with the police she was also under the influence and she was nervous. At the time of her police interview, she was not in custody, on parole, or on probation, and she told them the truth. Although the police did not threaten her, they said they could put her in jail if she did not talk to them. By the time of the preliminary hearing on March 11, 2008, Rudkin did not recall the substance of the telephone call or where she was when she received the telephone call. She only remembered what she had told the detectives

1   about the telephone call. [FN 5] The jury was informed that at the time of
2   Rudkin's preliminary hearing testimony, she was on "a felony probation,"
    and in 2001 "she had a prior felony conviction for first degree burglary."

3         [FN 5] Rudkin was not asked how many telephone calls she
          received from defendant. The prosecution proffered evidence that
4         defendant's cell phone records showed three outgoing calls were
          made to Rudkin after the murder: the first call was 35 seconds, the
5         second call was 15 seconds, and the third call was 54 seconds.

6   B. The Defense

7   Defendant chose not to testify. He recalled Detective Butler as a witness
    to testify concerning the unsuccessful search for the murder weapon and
8   ammunition. Although the police had looked unsuccessfully for the
    shotgun and any ammunition at locations where defendant had been
9   before and after the murder, the police did not search places where
    Washburn and Agredano had been either before or after the murder.
10  While Washburn had consented to a search of her storage unit, Butler did
    not know if the storage unit had actually been searched. Defendant's good
11  friend testified about his visit to her home in the early evening before the
    murder.
12

13  (Op. at 1–8.)

14                                  **DISCUSSION**

15  A.   **Standard of Review**

16        This Court may entertain a petition for writ of habeas corpus "in behalf of a person

17  in custody pursuant to the judgment of a state court only on the ground that he is in

18  custody in violation of the Constitution or laws or treaties of the United States." 28

19  U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996

20  ("AEDPA"), a district court may not grant a petition challenging a state conviction or

21  sentence on the basis of a claim that was reviewed on the merits in state court unless the

22  state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or

23  involved an unreasonable application of, clearly established Federal law, as determined

24  by the Supreme Court of the United States; or (2) resulted in a decision that was based on

25  an unreasonable determination of the facts in light of the evidence presented in the state

26  court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law

27  and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384–86 (2000),

28

1   while the second prong applies to decisions based on factual determinations, *Miller-El v.*

2   *Cockrell*, 537 U.S. 322, 340 (2003).

3       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

4   state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

5   question of law or if the state court decides a case differently than [the] Court has on a set

6   of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. "Under the

7   'unreasonable application' clause, a federal habeas court may grant the writ if the state

8   court identifies the correct governing legal principle from [the Supreme Court's]

9   decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

10   at 413. The federal court on habeas review may not issue the writ "simply because that

11   court concludes in its independent judgment that the relevant state-court decision applied

12   clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas

13   court making the "unreasonable application" inquiry should ask whether the state court's

14   application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

15   The federal habeas court must presume correct any determination of a factual issue made

16   by a state court unless the petitioner rebuts the presumption of correctness by clear and

17   convincing evidence. 28 U.S.C. § 2254(e)(1).

18       The state court decision to which Section 2254(d) applies is the "last reasoned

19   decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Barker v.*

20   *Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). When there is no reasoned opinion

21   from the highest state court considering a petitioner's claims, the court "looks through" to

22   the last reasoned opinion. *See Ylst*, 501 U.S. at 804. The denial of review by the

23   California Supreme Court was a summary denial. (Ans., Ex. 10.) Thus, the last reasoned

24   opinion is the California Court of Appeal's opinion on direct review. (Ans., Ex. 8.)

25       The Supreme Court has vigorously and repeatedly affirmed that under AEDPA,

26   there is a heightened level of deference a federal habeas court must give to state court

27   decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v.*

28   *Richter*, 562 U.S. 86, 103–04 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011)

1  (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a

2  highly deferential standard for evaluating state-court rulings' and 'demands that

3  state-court decisions be given the benefit of the doubt.'"  *Felkner*, 131 S. Ct. at 1307

4  (citation omitted).  With these principles in mind regarding the standard and limited scope

5  of review in which this Court may engage in federal habeas proceedings, the Court

6  addresses Petitioner's claims.

7  B.     **Legal Claims and Analysis**

8          1.     Instructional Error

9          Petitioner argues that because the jury returned a "not true" finding on the

10  allegation that he personally used a firearm, the jury must have relied in part upon an

11  aiding and abetting theory or a conspiracy theory to reach its verdict.  Based on this

12  assumption, Petitioner argues that two instances of instructional error violated his due

13  process rights and his right to a fair trial.  His first claim of instructional error is that the

14  instructions regarding "natural and probable consequences" misled the jury into believing

15  that it could find him guilty of first-degree murder without finding that he had the

16  requisite *mens rea*.  His second claim of instructional error is that CALJIC 3.00

17  incorrectly defined an aider and abettor as "equally guilty" as the perpetrator and failed to

18  inform the jury that an aider and abettor could be guilty of a lesser crime.

19          The Court of Appeal denied the claims of instructional error as follows:

20          I. Jury Instructions [FN 6]

21          In this case, the court instructed the jury it could convict defendant of
           first-degree murder or the lesser included offenses of second-degree

22          murder or voluntary manslaughter (CALJIC Nos. 8.10, 8.20, 8.30, 8.31,
           8.40) on various theories: (1) he was the actual perpetrator or an aider and

23          abettor in the commission of murder or the lesser include offenses
           (CALJIC Nos. 3.00, 3.01); (2) he aided and abetted assault with a deadly

24          weapon and murder was a natural and probable consequence of the assault
           (CALJIC No. 3.02); (3) he aided and abetted brandishing a firearm, and

25          murder was a natural and probable consequence of brandishing a firearm
           [FN 7] (CALJIC No. 3.02); or (4) he conspired to commit the crimes of

26          brandishing a firearm or assault with a deadly weapon, and murder was
           perpetrated by a co-conspirator in furtherance of that conspiracy and was a

27          natural and probable consequence of the agreed upon criminal objective of
           that conspiracy (CALJIC Nos. 6.10.5, 6.11).

28

[FN 6] Our discussion is based on the instructions given in this case. The court used language found in CALJIC instructions at the time of the trial in February and March 2009. For clarity and convenience, we refer to the CALJIC instructional numbering used by the court. We express no opinion on any post-trial modifications made to the CALJIC or CALCRIM instructions.

[FN 7] Although defendant questioned the submission of this alternative theory of guilt at trial, he presents no substantive argument on appeal that reversal is required on this basis. We therefore do not further address the issue. (*But see People v. Prettyman* (1996) 14 Cal.4th 248, 269 [court cautioned only that conviction for murder under the natural and probable consequence doctrine could not be based on "'trivial'" activities].)

Contrary to defendant's contentions, CALJIC Nos. 3.00 [FN 8], 3.02 [FN 9] and 6.11 [FN 10] have been held to be correct statements of the law generally. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 (*Canizalez* ) [discussing language in CALCRIM former No. 400 that corresponds to language in CALJIC No. 3.00]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 106–107 [CALJIC No. 3.02]; *People v. Prieto* (2003) 30 Cal.4th 226, 249–250 [CALJIC No. 6.11]; *but see People v. Nero* (2010) 181 Cal.App.4th 504, 518 ["even in unexceptional circumstances" court found language in CALJIC No. 3.00 "can be misleading"].) Because defendant did not request modification of these instructions on the grounds he now asserts on appeal, his claims of error are forfeited. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118–1119; *see Canizalez, supra*, 197 Cal.App.4th at p. 849; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.) Nevertheless, we will consider defendant's arguments in light of his contention that the given instructions prejudicially affected his substantial rights. (Pen. Code, § 1259 ["appellate court may ... review any instruction given, ... even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].)

[FN 8] The written instruction CALJIC No. 3.00 read, in pertinent part: "Persons who are involved in [committing] ... a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] 1. Those who directly and actively [commit] the act constituting the crime, or [¶] 2. Those who aid and abet the [commission] ... of the crime."

[FN 9] The written instruction CALJIC No. 3.02 read: "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime][those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶] In order to find the defendant guilty of the crime of murder, [as charged in Count One,] you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of brandishing or assault with a deadly weapon was committed; [¶] 2. That the defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crime of murder; and [¶] 4. The crime of murder was a natural and probable

consequence of the commission of the crime of brandishing or assault with a deadly weapon. [¶] [In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen.] [¶] [You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted, the commission of an identified and defined target crime and that the crime of murder was a natural and probable consequence of the commission of that target crime.]" The court also instructed the jury as to the elements of the crimes of assault with a firearm and exhibiting (brandishing) a firearm.

[FN 10]  The written instruction CALJIC No. 6.11 read: "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if that act or declaration is in furtherance of the object of the conspiracy. [¶] The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. [¶] [A member of a conspiracy is not only guilty of the particular crime that to [his][her] knowledge [his][her] confederates agreed to and did commit, but is also liable for the natural and probable consequences of any [crime][act] of a co-conspirator to further the object of the conspiracy, even though that [crime][act] was not intended as a part of the agreed upon objective, and even though [he][she] was not present at the time of the commission of that [crime][act]. [¶] You must determine whether the defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes, and, if so, whether the crime alleged [in Count[s] One ] was perpetrated by [a] co-conspirator[s] in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy.] [¶] [In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected would be likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural consequence' is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen.]"

Contrary to defendant's contentions, CALJIC No. 3.00 does not state a theory of guilt by telling the jury that, in effect, the actual perpetrator and the aider and abettor are—or must be found—guilty of the same offense, and given the other instructions, no juror would reasonably so interpret the language as defendant suggests. The instruction addresses only the basic, introductory concept of principal liability in that both an actual perpetrator of a crime and a person who aids and abets the perpetrator's commission of that crime are deemed to be principals, regardless of the extent or manner

of their participation in the crime. (§ 31 [FN 11]; *see People v. McCoy* (2001) 25 Cal.4th 1111, 1118, fn. 1 ["[w]hen the charged crime and the intended crime are the same, ... the aider and abettor must, indeed, share the actual perpetrator's intent"].) Consequently, if the jury in this case found defendant was a principal in the commission of first-degree murder (either as a direct perpetrator or an aider and abettor), he and any co-principal were "equally guilty" of that offense.

> [FN 11] Section 31 states, in pertinent part: "All persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, ... are principals in any crime so committed."

Alternatively, if the jury in this case found defendant guilty only as an aider and abettor or conspirator under the natural and probable consequence doctrine, "the 'equally guilty' statement is also correct." (*Canizalez, supra,* 197 Cal.App.4th at p. 850, fn. omitted.) "Aider and abettor culpability ... for a nontarget, or unintended, offense committed in the course of committing a target offense has a different theoretical underpinning than aiding and abetting a target crime. Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator [to] commit the target offense. By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime. It follows that the aider and abettor will always be 'equally guilty' with the direct perpetrator of an unintended crime that is the natural and probable consequence of the intended crime." (*Id.* at p. 852.) So, too, it follows that the conspirator will always be "equally guilty" with his co-conspirators of an unintended crime that is the natural and probable consequence of the intended crime. Thus, contrary to defendant's contention, the "equally guilty" language in CALJIC No. 3.00 is a correct statement of the law when applied to natural and probable consequences aider and abettor and conspirator culpability, and therefore, properly given in this case.

We are not persuaded by defendant's arguments that the other portions of the instructions magnified the purported error of the "equally guilty" language of CALJIC No. 3.00. "'Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.'" (*People v. Williams* (1995) 40 Cal.App.4th 446, 457, *quoting Boyde v. California* (1990) 494 U.S. 370, 380–381.) The jurors were adequately informed they were to treat first degree murder, second degree murder, and voluntary manslaughter as different crimes with different elements. The jury instructions given on first degree murder (CALJIC Nos. 8.00, 8.10, 8.11, 8.20), second degree murder (CALJIC Nos. 8.30, 8.31), and

1    voluntary manslaughter (CALJIC Nos. 8.40, 8.42, 8.43, 8.44, 8.50), as well
as the related specific mental states (CALJIC Nos. 2.02, 3.31.5), treated the
2    offenses as separate crimes and made clear that the defendant had to
possess the required mental state before he could be found guilty of any of
3    those offenses. The jury was also specifically told to consider separately
and determine unanimously whether defendant was guilty of first degree
4    murder, second degree murder, or voluntary manslaughter (CALJIC Nos.
8.50, 8.70, 8.71, 8.72, 8.74, 8.75), and specify the crime committed, if any,
5    in the verdict sheets (CALJIC Nos. 8.70, 17.50). Any doubt as to
defendant's liability for murder in the first degree, murder in the second
6    degree, or voluntary manslaughter, had to be resolved in defendant's favor
(CALJIC Nos. 8.71, 8.72). As part of its duty to determine whether the
7    defendant was guilty or not guilty "as to Count One for the crime of
murder in the first degree and lesser crimes," of "[m]urder in the second
8    degree" and "[v]oluntary manslaughter," the jury was told it had the
"discretion to choose the order in which [it] evaluate[d] each crime and
9    consider[ed] the evidence pertaining to it."

10   Defendant's reliance on *People v. Woods* (1992) 8 Cal.App.4th 1570
(*Woods*) is misplaced. In that case, two defendants (Barry Woods and John
11   Windham) were convicted of first degree murder after they both assaulted
two victims and Woods shot and killed another victim outside a nearby
12   apartment complex. (*Id.* at pp. 1577, 1579.) Windham was prosecuted
under the theory he was an aider and abettor of the first degree murder
13   committed by Woods outside the apartment complex because that murder
was a reasonably foreseeable consequence of the earlier assaults. (*Id.* at pp.
14   1579, 1596.) The appellate court reversed Windham's conviction,
concluding the trial court erred when it responded to a question from the
15   jury during deliberations by informing the jurors they could not convict
Windham of the nontarget offense of second degree murder as an aider and
16   abettor if they determined Woods (the perpetrator of the killing) was guilty
of first degree murder. (*Id.* at pp. 1577, 1590.) In so ruling, the *Woods*
17   court held that, "in determining aider and abettor liability for crimes of the
perpetrator beyond the act originally contemplated, the jury must be
18   permitted to consider uncharged, necessarily included offenses where the
facts would support a determination that the greater crime was not a
19   reasonably foreseeable consequence but the lesser offense was such a
consequence. Otherwise, ... the jury would be given an unwarranted,
20   all-or-nothing choice for aider and abettor liability." (*Id.* at p. 1588.) Thus,
"[i]f the evidence raises a question whether the offense charged against the
21   aider and abettor is a reasonably foreseeable consequence of the criminal
act originally aided and abetted but would support a finding that a
22   necessarily included offense committed by the perpetrator was such a
consequence, the trial court has a duty to instruct sua sponte on the
23   necessarily included offense as part of the jury instructions on aider and
abettor liability." (*Id.* at p. 1593.) Unlike the situation in *Woods*, the jurors
24   in this case were not "given an unwarranted, all-or-nothing choice" of
either convicting defendant of first degree murder or acquitting him of any
25   liability for the killing. (*Id.* at pp. 1588, 1590.) As a whole, the instructions
informed the jury of the elements and definitions to be considered in
26   evaluating whether defendant was guilty of first degree murder or any
lesser included offense, and the requisite mental states applicable to those
27   crimes.

28

Defendant also argues the trial court had a sua sponte duty to instruct the jury, as part of its aiding and abetting and conspiracy instructions, that premeditated murder—not just murder—was a natural and probable consequence of the target crimes of brandishing or assault with a firearm before it could convict defendant of first-degree murder. However, although the instructions on aiding and abetting (CALJIC No. 3.02) and conspiracy liability (CALJIC No. 6.11) based on the natural and probable consequence doctrine did not mention the degrees of murder, other instructions and the verdict forms required the jury to determine the degree of murder. Contrary to defendant's contentions, we see nothing in Woods that requires a trial court to sua sponte modify the CALJIC Nos. 3.02 and 6.11 instructions to include the degree of murder. [FN 12]

> [FN 12] Defendant's reliance on *People v. Hart* (2009) 176 Cal.App.4th 662 (*Hart*), is similarly misplaced. In *Hart*, the trial court instructed the jury concerning aiding and abetting liability for the nontarget offense of attempted murder under the natural and probable consequences doctrine using CALCRIM No. 402 (*Hart, supra,* 176 Cal.App.4th at p. 669), which is similar to the CALJIC No. 3.02 instruction that was used in this case. The *Hart* jury was advised to refer to separate instructions to decide whether the crimes of attempted murder and assault with a firearm were committed. (*Hart, supra,* 176 Cal.App.4th at p. 669.) The Third District reversed, concluding that the instructions did not fully inform the jury that in order to find a defendant guilty of attempted premeditated murder as a natural and probable consequence of attempted robbery, it was necessary to find that attempted premeditated murder, not just attempted murder, was a natural and probable consequence of the attempted robbery, and the general instructions concerning the premeditation and deliberation elements of attempted premeditated murder did not suffice. (*Hart, supra,* 176 Cal.App.4th at p. 673.) However, since the briefs were filed in this case, *Hart* has been disapproved to the extent it is inconsistent with *People v. Favor* (2012) 54 Cal.4th 868, 879, fn. 3 (*Favor*). In *Favor*, a majority of the court held that "the jury need not be instructed that a premeditated attempt to murder must have been a natural and probable consequence of the target offense." (*Id.* at p. 872.) Rather the trial court needs only to instruct that "attempted murder ... qualifies as the nontarget offense to which the jury must find foreseeability." (*Id.* at p. 879.) "[O]nce the jury finds that an aider and abettor, in general or under the natural and probable consequences doctrine, has committed an attempted murder, it separately determines whether the attempted murder was willful, deliberate, and premeditated." (*Id.* at pp. 879–880.) In so ruling, the *Favor* court distinguished attempted murder from murder that was at issue in *Woods.* (*Id.* at pp. 876–877.) However, for the reasons we have stated in the text of this opinion, *Woods* does not require reversal in this case.

Nor do we see any merit to defendant's contention that, under the instructions, the jurors were left to their own devices to determine how to reconcile the objective test of the natural and probable consequences with the subjective test for determining premeditation. We presume "jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citations.]" (*People v. Mills* (1991) 1

Cal.App.4th 898, 918; emphasis added.) The jurors never asked any questions or otherwise indicated they were confused by the instructions. Defendant argues the jurors did not ask any questions because "once they decided that Agredano was the direct perpetrator and that he had acted with deliberation and premeditation, the easiest way for the jury to resolve the issue of [defendant's] mental state was to rely upon the 'equally guilty' language of CALJIC No. 3.00." However, defendant's speculative argument as to how the jury may have applied the instructions is not persuasive in light of our conclusions that CALJIC No. 3.00 is not a theory of guilt and was otherwise properly given in this case. At trial defendant did not premise his defense on an argument that even if the actual shooter was guilty of first degree murder, defendant was guilty of unpremeditated murder or voluntary manslaughter. He argued only that he was not involved in any killing either as an actual perpetrator, aider and abettor, or conspirator, and at most he may have been guilty of being an accessory after the fact, which was an offense that was not before the jury for its consideration. Neither the jury instructions nor the prosecutor's closing arguments precluded the jury from considering defendant's arguments. By its verdict that defendant was guilty of first degree murder, the jury necessarily rejected his arguments. We therefore conclude any purported instructional error was harmless under any standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) [FN 13]

> [FN 13] In his opening brief, defendant contends the court's instructions on aiding and abetting liability based on the natural and probable consequence doctrine and conspiracy were prejudicial because the jury's finding that he did not personally use a firearm indicated it clearly rejected the theory that he personally shot Watson, and therefore his conviction for first degree murder depended on the jury finding him either an aider and abettor or a conspirator. In his reply brief, defendant clarifies his argument by contending the not true finding on the personal use of a firearm allegation is evidence the jury may have believed he did not intend to kill Watson and, if properly instructed, would have rendered a more favorable verdict. We conclude defendant's arguments based on the jury's verdict are not persuasive. The jury's verdict "shows only that there was a reasonable doubt in the minds of the jurors that defendant specifically used a [weapon]." (*People v. Santamaria* (1994) 8 Cal.4th 903, 919.) It does not show the reverse, that the jury found defendant was an aider and abettor or conspirator. (*Ibid.*) "The jury may merely have believed, and most likely did believe, that defendant was guilty of murder as either a personal [weapon] user or an aider and abettor [or conspirator], but it may have been uncertain exactly which role defendant played. That ... would fully explain, and necessitate, the split verdict. [Fn. omitted.]" (*Ibid.*; *see People v. Thompson* (2010) 49 Cal.4th 79, 119.)

(Op. at 9–16.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v.*

1  *Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637,

2  643 (1974) ("'[I]t must be established not merely that the instruction is undesirable,

3  erroneous or even "universally condemned," but that it violated some [constitutional

4  right].'"). The instruction may not be judged in artificial isolation, but must be

5  considered in the context of the instructions as a whole and the trial record. *See Estelle*,

6  502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of

7  the overall charge to the jury as a component of the entire trial process. *United States v.*

8  *Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

9  The defined category of infractions that violate fundamental fairness is very narrow:

10  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause

11  has limited operation." *Estelle*, 502 U.S. at 73.

12          The Due Process Clause of the Fourteenth Amendment protects the accused

13  against conviction except upon proof beyond a reasonable doubt of every fact necessary

14  to constitute the crime with which he or she is charged. *In re Winship*, 397 U.S. 358, 364

15  (1970). *See, e.g., Solis v. Garcia*, 219 F.3d 922, 926–27 (9th Cir. 2000) (*Winship* rule not

16  violated where jury was given instructions on liability under the natural and probable

17  consequences doctrine that included all elements of second degree murder, even though

18  jury was not given instructions on the target crime of second degree murder which

19  defendant allegedly committed as an aider and abettor). But instructions that lessen the

20  prosecution's burden will be subject to harmless error review, rather than structural error

21  review, "unless *all* the jury's findings are vitiated." *Byrd v. Lewis*, 566 F.3d 855, 866 (9th

22  Cir. 2009) (emphasis in original) (citing *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008)

23  (finding application of harmless error analysis of a defective jury instruction was proper

24  because the instructional error was only with respect to one element and did not vitiate

25  the jury's finding of guilt on the charged offense)).

26          In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors

27  could or would have understood the instruction as a whole; rather, the court must inquire

28  whether there is a "reasonable likelihood" that the jury has applied the challenged

1  instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & n.4;

2  *Boyde v. California*, 494 U.S. 370, 380 (1990). In order to show a due process violation,

3  the petitioner must show both ambiguity and a "reasonable likelihood" that the jury

4  applied the instruction in a way that violates the Constitution, such as relieving the state

5  of its burden of proving every element beyond a reasonable doubt. *Waddington v.*

6  *Sarausad*, 555 U.S. 179, 190–91 (2009) (internal quotations and citations omitted).

7       A determination that there is a reasonable likelihood that the jury has applied the

8  challenged instruction in a way that violates the Constitution establishes only that an error

9  has occurred. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998). If an error is found,

10  the court also must determine that the error had a substantial and injurious effect or

11  influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637

12  (1993), before granting relief in habeas proceedings, *see Calderon*, 525 U.S. at 146–47.

13           a)      CALJIC Nos. 3.02 and 6.11 (natural and probable consequences
                        theory)
14

15       Petitioner argues that CALJIC Nos. 3.02 and 6.11 failed to require the jury to find

16  all of the facts necessary to sustain a conviction of first-degree murder on a natural and

17  probable consequences theory. (*Id.* at 20–21.) Petitioner argues that the instructions

18  failed to instruct the jury that in order to find him guilty of first-degree murder, the jury

19  "should have been required to determine whether *premeditated* murder (as opposed to

20  'murder' generally) was a reasonably foreseeable natural and probable consequence of a

21  conspiracy to brandish a weapon or committed assault with a deadly weapon." (Docket

22  No. 1 at 23–24 (emphasis in original).) By failing to make this clear, Petitioner argues

23  that the jury was unaware that it could find Petitioner guilty of a lesser included crime

24  under the natural and probable consequences theory. (Docket No. 1 at 18.)

25       Based on a review of the record and the applicable law, the Court finds that

26  Petitioner fails to state a claim meriting habeas relief. As instructed by the Supreme

27  Court, the Court considers CALJIC Nos. 3.02 and 6.11 in the context of the instructions

28  as a whole and the trial record. *Estelle*, 502 U.S. at 73. The instructions show that the

1  Court specified that there were differing degrees of murder, each accompanied by

2  differing levels of intent:

3            If you find that the killing was preceded and accompanied by a clear,
   deliberate intent on the part of the defendant to kill which was the result of
4  deliberation and premeditation so that it must have been formed upon pre-existing
   reflection and not under a sudden heat of passion or other condition precluding the
5  idea of deliberation, it is murder in the first degree. . . . .

6            Murder of the second degree is also the unlawful killing of a human being
   with malice aforethought when the perpetrator intended unlawfully to kill a human
7  being but the evidence is insufficient to prove deliberation and premeditation.

8            Murder of the second degree is the unlawful killing of a human being when
   the killing resulted from an intentional act, the natural consequences of the act
9  were dangerous to human life, and the act was deliberately performed with
   knowledge of the danger to and with conscious disregard for human life.

10
             When the killing is the direct result of such an act, it is not necessary to
11 prove that the defendant intended that the act would result in the death of a human
   being. . . .

12
             Every person who unlawfully kills another human being without malice
13 aforethought but either with an intent to kill or with conscious disregard for human
   life is guilty of voluntary manslaughter in violation of Penal Code section 192,
14 subdivision (a).

15 RT at 1148–50. After closing arguments, the Court further instructed the jury that in

16 order to find Petitioner guilty, it must also find that Petitioner had the necessary *mens rea*:

17           However, you may not find the defendant guilty of the crime charged in
   Count 1, which would be murder in the first or second degree, or voluntary
18 manslaughter, which is a lesser crime, unless the proved circumstances are not
   only consistent with theory that the defendant had the required specific intent, or
19 mental state but cannot be reconciled with another other rational conclusion . . . .

20           In the crime charged in Count 1, there must exist a union or joint operation
   of act or conduct and a certain mental state in the mind of the perpetrator. Unless
21 this mental state exists, the crime to which it relates is not committed.

22           The mental state required is included in the definition of the crime which
   the Court read yesterday and is set forth in the instructions.
23
             In the crime of murder, the necessary mental state is malice aforethought.
24

25 *Id.* at 1233–34. The instructions instructed the jury to resolve any doubts as to

26 Petitioner's liability in favor of Petitioner. *Id.* at 1153–54. In addition, the verdict sheets

27 required the jury to specify what crime was committed (first degree murder, second

28 degree murder, or manslaughter). CT at 648–52.

1    Moreover, the Court finds unpersuasive Petitioner's argument that the jury's not-
2    guilty finding with respect to the special allegation indicates that the jury may have
3    believed that Petitioner did not intend to kill the victim, and that therefore the jury found
4    Petitioner guilty of first-degree murder under either an aiding and abetting theory or a
5    conspiracy theory, but without finding that Petitioner had the requisite *mens rea*.  As the
6    state appellate court pointed out, there are other explanations for the split verdict.  The
7    split verdict could also indicate that the jury was uncertain as to exactly what role
8    Petitioner played in the commission of the crime, *e.g.*, whether he planned the murder;
9    whether he instigated or encouraged the murder; or whether he shot the victim.  *See* Op.
10   at 16.

11    Considering CALJIC Nos. 3.02 and 6.11 in the context of the instructions as a
12   whole, the state appellate court reasonably rejected Petitioner's arguments that the jury
13   incorrectly found Petitioner guilty of first-degree murder without also finding that
14   Petitioner had the intent to commit first-degree murder, or without also finding that first-
15   degree murder was a foreseeable consequence.  The state appellate court reasonably
16   concluded that, viewing the instructions as a whole, the jurors were adequately instructed
17   to find that Petitioner had the *mens rea* necessary for first degree murder, even if found
18   liable under an aiding and abetting theory of liability or a conspiracy theory of liability.
19   Keeping in mind that juries are presumed to follow the court's instructions, *Weeks v.*
20   *Angelone*, 528 U.S. 225, 234 (2000), the Court finds that it is not reasonably likely that
21   the jury ignored the specific instructions regarding the necessary mental states for the
22   varying degrees of murder and found Petitioner guilty of first degree murder without also
23   finding that he had the necessary *mens rea*.  Moreover, there is no clearly established
24   federal law, as set forth by the United States Supreme Court, that a natural and probable
25   consequences theory of liability precludes finding that a defendant is guilty of first-degree
26   murder.  *Cf. Windham v. Merkle*, 163 F.3d 1092, 1104 (9th Cir. 1998) (finding that
27   CALJIC 3.02, concerning aider and abettor's liability for the natural and probable
28   consequences of cohorts' actions, does not shift the burden of proving the requisite intent

1    for the contemplated offense; and distinguishing between the requirement that an aider

2    and abettor intend to commit the contemplated crime and the vicarious liability imposed

3    on an aider and abettor for the acts of his cohorts that are the natural and probable

4    consequences of the crime originally contemplated).

5         Moreover, assuming there was error, it was not prejudicial.  On federal habeas

6    review, reversal is only warranted if the error had a "'substantial and injurious effect or

7    influence in determining the jury's verdict.'"  *Brecht*, 507 U.S. at 637(internal quotation

8    marks and citation omitted); *see also Fry v. Pliler*, 551 U.S. 112, 120–22 (2007) (*Brecht*

9    harmless error standard applies on collateral review by federal habeas court where state

10   appellate court failed to recognize the error and did not review it for harmlessness).

11   There was evidence that Petitioner was either the actual shooter, or an aider and abettor to

12   the plan to kill the victim, or conspired to kill the victim.  The testimony of Jessica

13   Dominguez, Petitioner's girlfriend at the time, and Washburn, as corroborated by other

14   testimony, supported a finding that Petitioner had the necessary *mens rea* for first degree

15   murder.  Washburn testified that the night before the murder, Washburn drove Agredano

16   and Petitioner to Concord where Petitioner picked up a green duffle bag that contained a

17   gun.  RT at 523–24.  Makinano testified that the night before the murder, Petitioner

18   picked up a green bag containing a gun from Makinano's residence.  He also testified that

19   Petitioner arrived in and departed in a car that matched the description of Washburn's car

20   and that he saw a man and a woman sitting in the car waiting for Petitioner.  *Id.* at

21   429–35.  Dominguez testified that Petitioner told her that the victim needed to be "dealt

22   with," RT at 786, 788, and 810; that he accompanied Agredano to the victim's door (*id.* at

23   787); that he was present when the door was kicked in and when the victim died (*id.* at

24   787 and 811–13); and that he told Dominguez "we shot him," referring to the victim (*id.*

25   at 812–13).  Based on this testimony, the jury could reasonably find that the killing was

26   preceded and accompanied by a clear, deliberate intent to kill on the part of Petitioner.

27   Petitioner cannot demonstrate that the state appellate court's denial of this claim was

28

contrary to, or an unreasonable application of, the clearly established federal law, or that
it was based upon an unreasonable determination of the facts.

              **b)**     **CALJIC No. 3.00**

Petitioner argues that CALJIC No. 3.00 incorrectly defined an aider and abettor as
"equally guilty" as the perpetrator and did not inform the jury that an aider and abettor
could be guilty of a lesser included crime. CALJIC No. 3.00, as given, stated:

> Persons who are involved in committing a crime are referred to as principals in
> that crime. Each principal, regardless of the extent or manner of participation is
> equally guilty. Principals include those who directly and actively commit the act
> constituting the crime, or those who aid and abet the commission of the crime.

RT 1140.

Petitioner argues that CALJIC No. 3.00 was an incorrect statement of state law.
However, a challenge to a jury instruction solely as an error under state law does not state
a claim cognizable in federal habeas corpus proceedings. *See Estelle*, 502 U.S. at 71–72.

Petitioner also argues that CALJIC No. 3.00 failed to require the state to prove
every element of the offense, in violation of the due process clause and the right to a fair
trial. *See, e.g., Winship*, 397 U.S. at 364 (due process clause requires that a conviction be
based upon proof beyond a reasonable doubt of every fact necessary to constitute the
charged crime). Based on a review of the record and the applicable law, the Court finds
that Petitioner fails to state a claim meriting habeas relief. As discussed in detail *supra*,
the jury was adequately instructed that it must find that Petitioner had the *mens rea*
necessary for first degree murder, even if it found Petitioner liable under an aiding and
abetting theory of liability. Even if CALJIC No. 3.00 improperly allowed the jury to find
Petitioner guilty of first degree murder without determining that Petitioner had the
premeditated intent to kill, CALJIC No. 3.00 cannot be read in isolation and there is no
indication in the record that the jury ignored the specific instructions regarding the
necessary mental states for the varying degrees of murder. There was evidence that
Petitioner had the requisite *mens rea* for first degree murder, as discussed *supra*, and the
jury instructions emphasized the different *mens rea* required for the differing degrees of

1    murder.  Petitioner cannot demonstrate that the state appellate court's opinion was

2    contrary to, or an unreasonable application of, the clearly established federal law, or that

3    it was based on an unreasonable determination of the facts.

4        2.    Failure to Disclose Makinano's Competency Reports and Limitation on
              Cross-Examination

5

6        Petitioner argues that the trial court violated his rights under the Confrontation

7    Clause and the Compulsory Process Clause, as well as his due process rights when it

8    refused to disclose to defense counsel the competency reports of prosecution witness

9    Makinano.  Petitioner also argues that his rights under the Confrontation Clause were

10   violated when the trial court limited the scope of defense counsel's cross-examination of

11   Makinano.  The state appellate court denied his claim as follows:

12       Before trial, defendant moved in limine to exclude the testimony of Felix
         Makinano on the ground that at the time of the murder he was "so [a]ffected by
13       drug use and/or mental illness as to be incompetent to testify." In support of the
         request, defendant asserted he was "informed and believes the Solano County
14       Court appointed three professionals to evaluate Mr. Makinano's competenc[y] to
         stand trial in his own pending matter. These records were subpoenaed by counsel
15       in October 2008 and should be sealed in the court file herein. [Evidence Code
         section] 701." [FN 14]
16
         [FN 14] Evidence Code section 701 reads, in pertinent part: "(a) A person is
17       disqualified to be a witness if he or she is: [¶] (1) Incapable of expressing
         himself or herself concerning the matter so as to be understood, either
18       directly or through interpretation by one who can understand him; or [¶] (2)
         Incapable of understanding the duty of a witness to tell the truth."
19
         Several hearings on the matter were held outside the presence of the jury. The trial
20       court agreed to hold an Evidence Code section 402 hearing to determine
         Makinano's testimonial competency. However, the court denied defense counsel's
21       request to release the two subpoenaed sealed competency reports [FN 15] that had
         been received by the court—either for the purpose of the Evidence Code section
22       402 hearing or cross-examination, depending on the evidence adduced at the
         hearing. The court agreed with one of the psychologists that "these records are
23       definitively privileged." The court was willing to release "the bottom line," ruling
         that the other information "is confidential and not disclosable." In response,
24       defense counsel argued there was case law allowing privileged records to be
         released if it was necessary for a fair trial. Defense counsel indicated the court
25       could release the reports with a protective order, asserting that he needed to know
         more than the determination reached by the experts. "It is the symptoms and the
26       disorders that Mr. Makinano may suffer from that affect—maybe not so much his
         ability to testify now, but they refer back to the events that he's going to be trying
27       to recall and testifying about as well as at the time he was interviewed." In
         response, the court stated: "I can tell you that he was interviewed on November
28       21st, 2007, at the Solano County jail, ... [a]nd it was in regard to the charges of

carrying a dirk or dagger[,] which were dated October 16th, 2007.[¶] I think I can tell you that while at the County Jail the jail medical doctor had prescribed some medication for him. However, the bottom line of [the psychologist] was not only that Mr. Makinano was competent to stand trial at that time but also that he was capable of making rational decisions about his medication. [¶] It's a very, very brief report. It is a grand total of two and a half pages." Defense counsel then made a formal request for the release of the report to him with a protective order so that he could be a little more informed. The court replied: "We are going to have the 402 hearing with Mr. Makinano tomorrow. Should information in this report become pertinent while he's being questioned, I may release more information. But at this time this is all I'm going to release." Defense counsel also asked to know if the psychologist had come to a "psychological diagnosis," and if so, if Makinano had "an illness that m[ight] impact a witness's ability to be a witness or to recall, recollect, and relate...." The prosecutor replied there was no diagnosis because the report related to whether Makinano was competent to stand trial, to which the court stated, "That's correct. It was not a diagnosis."

> [FN 15] One psychologist appeared in court in response to the defense subpoena. She asserted "privilege" for the report she had prepared relating to Makinano. When asked to explain the assertion, the psychologist stated the records were confidential and they were held in confidence. "As being his psychologist, the person who conducted the evaluation, it's my responsibility that those records don't fall into hands that can be used against Mr. Makinano." When asked if she was prohibited from producing the records to the court, the psychologist replied it was her understanding she would produce the records to the court and ask the court to hold them in confidence. The court said the records would be accepted "for the Court file," and the court would review them at some later time.

The court held an Evidence Code section 402 hearing regarding Makinano's testimonial competency. Before the hearing, defense counsel again asked to review the subpoenaed competency reports for the purpose of conducting the hearing. The court denied the request. Defense counsel also asked the court if its review "yield[ed] any information that would bear on [counsel's] ability to cross-examine on the issue presented at the 402 hearing, which would be essentially competenc[y] to testify under section 701 of the Evidence Code." The court replied, "[W]e have two conflicting opinions from two separate psychologists. That's where we are now. We do not have the third document which you subpoenaed which potentially is the tie breaker, but we haven't seen it. So for now one document says he wasn't [competent] and one document says he was [competent.]" Defense counsel then proceeded to question Makinano.

Makinano testified he was not then on medication nor had he been prescribed medication to be taken the morning of the hearing. Nor was he under the care of mental health professionals. However, within the last year he had been prescribed medication because he was hallucinating. He was not sure when he was first prescribed the medication, but it was after he was arrested in Solano County in October 2007. Makinano had been hearing voices. When asked if he was seeing things that weren't there, Makinano replied, "No, I think I was hearing things more than seeing things." When asked how long he had been hearing voices before he was jailed in Solano County, the witness replied, "Well, I never told anybody, but ... occasionally, when I use[d] meth ... I started to hear voices. It started to take a toll on me, yeah."

When first asked how long he had been experiencing the phenomenon of hearing voices, Makinano said, "Through my use of ... drugs, and that would be like 15 to 18 years," starting at the age of 13. He later testified he began to hear voices "just within the last year." Makinano "imagine[d]" that his hearing voices in October 2007 interfered with his ability to accurately perceive what was going on around him. He began hearing voices before he went to jail. He heard voices in September 2007, which led him to call the police. He dialed 911 because he thought someone was trying to kill him. He could not recall if he heard voices as early as August 2007, but he did not think so because he "was clean" for two and a half years.

Makinano then testified he had "relapsed" at the end of March 2007. When asked if he heard voices between March and "say the start of summer of 2007," the witness replied, "Not at first." When asked if he recalled hearing voices during the summer, the witness replied, "not as bad as it was ... after the situation happened, no." Even though it wasn't as severe, the witness said the voices had begun by the summer of 2007. Makinano associated hearing the voices with his use of methamphetamine. When asked if he used methamphetamine during the summer of 2007, the witness said, "Yes, when I relapsed, yeah."

When first asked if his use of methamphetamine during the summer of 2007 affected his ability to accurately comprehend what was going on around him, the witness replied, "Of course I made a wrong choice." However, when he was again asked if his drug use affected his ability to accurately understand what was going on around him, the witness replied, "At time no .... [n]ot in the summer." When asked if hearing voices periodically affected his ability to understand what was going on around him, the witness replied, "I can say that it made me using and hearing voices, yeah, I made the wrong choice of a couple [of] things, yeah." When defense counsel indicated he was not talking about choices, but asking if Makinano believed he was able "to accurately sort of perceive and understand what was going on around [him]," the witness replied, "Yes."

When asked if he believed his memory had been affected by his previous use of methamphetamine, Makinano replied, "For the long use of me using, sure it has." When asked in what ways his memory had been affected, Makinano stated: "Dates, names, and so on," and "events too." However, as he sat in court the witness thought his memories were accurate. When asked if his memories could be based on hallucinations, the witness replied, "I can say they're based on truth."

Makinano recalled defendant came to his Concord apartment on three occasions. When asked if those occasions were during March and September of 2007, the witness indicated the occasions occurred in the beginning and during his relapses. When asked if he believed his use of methamphetamine in that time frame prevented him from now remembering accurately what happened when defendant came to his apartment, Makinano replied: "I can tell you that there would be things that I don't remember and there would be things that I do remember." When asked if it was possible that some of the things he did remember were based on hallucinations and not reality, the witness replied, "No." On cross-examination, Makinano confirmed he was not then experiencing hallucinations and he knew the difference between the truth and a lie.

At the conclusion of the hearing, defense counsel submitted on the issue of Makinano's testimonial competency. The court ruled Makinano would be allowed to testify before the jury. "He understood the questions asked. He answered appropriately. He appeared to me to answer truthfully and consider and weigh answers before he provided them." Counsel then addressed other aspects of the

1   witness's testimony that would be allowed to be presented to the jury. Specifically,
2   the prosecutor asked—based upon the competency hearing—whether the court
    was going to allow defense counsel to question Makinano about hallucinations in
3   front of the jury. The court ruled: "I don't see that it's appropriate. He answered
    those questions specifically. And ... clearly he's a meth user and has been a meth
4   user for a long time. No one is trying to paint any other picture of him than that.
    But in terms of hallucinations, I don't believe I'm going to allow it...." Defense
5   counsel objected, stating: "Just for the record, let me indicate that I believe it
    would be appropriate for the jury to hear that so they can appropriately evaluate his
6   testimony. I understand the Court's ruling and I won't ... invite it." [FN 16]

7       [FN 16] In his briefs, defendant suggests the trial court should have
        permitted cross-examination regarding Makinano's hallucinations based on
8       Makinano's statements that were recorded in a police report prepared after
        his arrest in October 2007. According to defendant, Makinano's statements
9       to the police "draw a direct link" between his hallucinations and the events
        surrounding defendant and the shotgun. However, defendant never asked
10      the trial court to consider Makinano's statements in the police report before
        ruling on the matter. "[W]e cannot hold the trial court abused its discretion
11      in rejecting a claim that was never made." (*People v. Valdez* (2004) 32
        Cal.4th 73, 109.)

12  B. Analysis

13  1. Withholding of Competency Reports
    Defendant argues the trial court's failure to release the competency reports
14  prejudicially undermined his right to cross-examine Makinano at both the
    Evidence Code section 402 hearing and at trial. We disagree. The trial court
15  examined the reports in camera and essentially concluded that with some very
    minor exceptions they contained no information that would require disclosure to
16  ensure defendant a fair trial. We have also examined the reports in camera and
    concur with the trial court's ruling. The reports contain no information that would
17  have any arguable bearing on Makinano's mental state or ability to perceive and
    accurately recall events that occurred at the time of his meetings with defendant in
18  the summer of 2007 or at the time of Makinano's interview with the police
    regarding defendant. Consequently, we see no prejudicial error in the trial court's
19  refusal to release Makinano's competency reports. [FN 17]

20      [FN 17] In light of our determination, we do not need to address
        defendant's appellate argument that the competency reports were not
21      privileged pursuant to the psychotherapist-patient privilege under the
        Evidence Code. We also deny defendant's request that we make the
22      competency reports available to him if they are, in fact, discoverable so that
        he might demonstrate prejudicial error. Before defendant filed his opening
23      appellate brief, we denied his motion to unseal the competency records. In
        so ruling, we explained: "There is no indication the competency evaluations
24      were provided to either [defendant] or his counsel in the trial court. The
        right to appellate review is limited to a determination as to whether the
25      lower court's ruling was correct. This court may make its determination by
        reviewing the sealed, confidential documents. (*See People v. Price* (1991) 1
26      Cal.4th 324, 493 [appellate counsel not entitled to view privileged material
        to assess whether trial court properly ruled on discovery request]; *see also*
27      *People v. Collins* (1986) 42 Cal.3d 378, 395, fn. 22; *Herrera v. Superior
        Court* (1985) 172 Cal.App.3d 1159, 1163; Cal. Rules of Court, rule
28      8.328(c)(6).) Moreover, there is no indication that [defendant's] counsel has

sought Makinano's consent to unseal confidential and privileged competency evaluations as to which Makinano holds the privilege and has a privacy interest. (*See People v. Price, supra,* 1 Cal.4th at p. 493.)" On appeal defendant renews his request for disclosure of the competency reports, pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and its progeny, and the reciprocal discovery rules in Penal Code sections 1054 et. seq. However, at trial defendant did not argue he was entitled to disclosure of the subpoenaed competency reports because the reports were in the government's possession within the meaning of *Brady.* Additionally, defendant cites no decision, and we have found none, "concluding that records physically in the hands of private psychologists, and which have been sought through subpoenas directed to private parties, fall within ... *Brady*" merely because the psychologists were court-appointed to perform an examination to determine the witness's competency to stand trial in an unrelated proceeding. (*People v. Hammon* (1997) 15 Cal.4th 1117, 1125, fn. 3.) *Barnett v. Superior Court* (2010) 50 Cal.4th 890, *People v. Coyer* (1983) 142 Cal.App.3d 839, and *People v. Kelley* (1997) 52 Cal.App.4th 568, are factually distinguishable from this case, and do not warrant disclosure of the competency reports.

2. Limitation on Cross–Examination

We also see no error in the trial court's refusal to allow defense counsel to cross-examine Makinano regarding his hallucinations. "Except as otherwise provided by statute, no evidence is admissible except relevant evidence. (Evid. Code, § 350.) Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact....' (*Id.,* § 210.) The trial court is vested with wide discretion in determining the relevance of evidence. [Citation.] The court, however, has no discretion to admit irrelevant evidence. [Citation.] 'Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' [Citation.]" (*People v. Babbitt* (1988) 45 Cal.3d 660, 681–682 (*Babbitt*) ; *see People v. Kraft* (2000) 23 Cal.4th 978, 1035 ["evidence leading only to speculative inferences is irrelevant"].)

Contrary to defendant's contentions, the court's ruling did not violate any state evidentiary rules or abridge his federal constitutional right to confront a witness by preventing an effective cross-examination of Makinano. Makinano attributed his hallucinations to his chronic use of methamphetamine. However, he explicitly testified that his ability to perceive and recall the events in the summer of 2007 was impacted by his chronic drug use, not his hallucinations. [FN 18] At trial defendant made no offer of proof that Makinano's hallucinations, separate from his chronic drug use, would likely have affected his ability to accurately perceive and recall relevant events in the summer of 2007. Without expert testimony regarding the issue, " '[t]he inference which defendant sought to have drawn from the [proffered evidence] is clearly speculative, and evidence which produces only speculative inferences is irrelevant evidence.' [Citation.]" (*Babbitt, supra,* 45 Cal.3d at p. 682; *see People v. Stitely* (2005) 35 Cal.4th 514, 549–550; *see also People v. Rubin* (2008) 168 Cal.App.4th 1144, 1148 ["there is no due process right to present irrelevant evidence"].) Additionally, the court ruled only that defense counsel would not be allowed to question Makinano about his hallucinations. Defense counsel

1

was not precluded from questioning Makinano about the effect of his

2

chronic use of methamphetamine on his ability to accurately perceive and recall his meetings with defendant and his later interview with the police.

3

[FN 19] Thus, even if the trial court erred in its ruling, we conclude it was harmless under any standard of review. (*Chapman v. California, supra,* 386 U.S. at p. 24; *People v. Watson, supra,* 46 Cal.2d at p. 836.)

4

5

[FN 18] Contrary to defendant's contention, Makinano never testified that his hallucinations "'somewhat' affected his memory of the summer

6

of 2007. In support of this contention, defendant refers us to pages 411 and 412 of the trial transcript. At those pages the following questioning

7

took place: [Defense Counsel]: "And now the same question with hearing the voices. Do you think, having had that experience in 2007 of

8

hearing these voices, do you think that affects your memory as you sit here now of things that happened in 2007 in the summertime? [¶]

9

[Makinano]: Say that again. [¶] The Court: Can you remember back today to events that happened in the summer? [¶] [Makinano]:

10

Somewhat, sure, yeah." Thus, contrary to defendant's contention, the record indicates Makinano was answering the court's question, and not

11

counsel's earlier question as to whether his hearing voices affected his memory. Our reading of the record is supported by Makinano's later

12

responses to questions in which he explicitly stated his belief that his hallucinations did not affect his memory of the events in the summer of 2007.

13

14

[FN 19] Although defendant cross-examined both Washburn and Dominguez about their drug use, and a portion of Rudkin's preliminary

15

hearing testimony that was read to the jury included cross-examination about her drug use, defense counsel apparently choose not to question Makinano about his drug use.

16

Op. at 17–24.

17

       a.    Withholding of Competency Reports

18

     The Confrontation Clause of the Sixth Amendment provides that in criminal cases

19

the accused has the right to "be confronted with the witnesses against him." U.S. Const.

20

amend. VI. The federal confrontation right applies to the states through the Fourteenth

21

Amendment. *Pointer v. Texas,* 380 U.S. 400, 403 (1965). The ultimate goal of the

22

Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than

23

a substantive guarantee. *Crawford v. Washington,* 541 U.S. 36, 61 (2004). It commands,

24

not that evidence be reliable, but that reliability be assessed in a particular manner: by

25

testing in the crucible of cross-examination. *Id.; see Davis v. Alaska,* 415 U.S. 308,

26

315–16 (1974) (noting a primary interest secured by the Confrontation Clause is the right

27

of cross-examination). The Clause thus reflects a judgment, not only about the

28

1  desirability of reliable evidence, but about how reliability can best be determined.

2  *Crawford*, 541 U.S. at 61; *see, e.g., United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th

3  Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify

4  under oath, forcing witnesses to undergo cross-examination, and permitting the jury to

5  observe the demeanor of witnesses). Confrontation Clause claims are subject to harmless

6  error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-

7  *Crawford* case); *see also United States v. Allen*, 425 F.3d 1231,1235 (9th Cir. 2005).  For

8  purposes of federal habeas corpus review, the standard applicable to violations of the

9  Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial

10  effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing

11  *Brecht*, 507 U.S. at 637.

12         Petitioner argues that the "due process, confrontation, and cross-examination

13  principles of *Davis v. Alaska*, 415 U.S. 308 (1974), and *Pennsylvania v. Ritchie*, [] 480

14  U.S. 39, mandated the disclosure of relevant privileged records to defendants at trial" and

15  that the state appellate court made an unreasonable determination of fact when it found

16  that the competency reports did not need to be disclosed to Petitioner. (Docket No. 1 at

17  47.)  Petitioner overstates the holding of *Davis v. Alaska*, 415 U.S. 308 (1974), and

18  *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987).

19         In *Davis v. Alaska*, the Supreme Court found that the Confrontation Clause

20  outweighed the Alaska's asserted interest in preserving the confidentiality of juvenile

21  adjudications of delinquency and required that the defendant be allowed to impeach the

22  credibility of a prosecution witness with his juvenile record and related probation status.

23  However, the *Davis* court also found that the juvenile record and related probation status

24  was directly related to the witness' reliability and credibility. *Davis*, 415 U.S. at 317–18.

25  In Petitioner's case, both the trial court and the appellate court reviewed the competency

26  reports *in camera* and concluded the opposite of the *Davis* court – that the reports were

27  not relevant to the witness' reliability and credibility to the extent that would require

28  disclosure to ensure a fair trial.

1    In *Pennsylvania v. Ritchie*, the Supreme Court found that the Confrontation Clause

2    did not require the disclosure of the Children and Youth Services record to the petitioner.

3    480 U.S. at 54.  The Supreme Court clarified its holding in *Davis v. Alaska*, stating: "The

4    constitutional error in [*Davis v. Alaska*] was *not* that Alaska made this information

5    confidential; it was that the defendant was denied the right 'to expose to the jury the facts

6    from which jurors . . .  could appropriately draw inferences relating to the reliability of

7    the witness.'" *Id.* (citing *Davis*, 415 U.S. at 318).  The Supreme Court explicitly stated

8    that the Confrontation Clause was implicated only where there was a specific statutory or

9    court-imposed restriction at trial on the scope of questioning:

> The opinions of [the Supreme] Court show that the right to confrontation is a *trial right*, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination.  The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony.  Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses.  In short, the Confrontation Clause only guarantees an *opportunity* for effective cross-examination, not cross examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Id.* at 52–53 (emphasis in original; quotations, citations, and footnotes omitted).

    Neither *Davis v. Alaska* nor *Ritchie v. Washington* support Petitioner's claim that

the trial court's refusal to release Makinano's competency reports violated his right to

confrontation.  In Petitioner's case, two separate courts reviewed the competency reports

and found that the withholding of these reports would not affect Petitioner's right to a fair

trial.  After reviewing the reports, the state appellate court concluded that "[t]he reports

contain no information that would have any arguable bearing on Makinano's mental state

or ability to perceive and accurately recall events that occurred at the time of his meetings

with defendant in the summer of 2007 or at the time of Makinano's interview with the

police regarding defendant."  The reports therefore would not have assisted Petitioner in

assessing Makinano's reliability.  Accordingly, the withholding of the competency reports

did not violate the Confrontation Clause.  *Crawford*, 541 U.S. at 61 (ultimate goal of

Confrontation Clause is to ensure reliability of evidence); *Ritchie*, 480 U.S. at 53

1  (Confrontation Clause only guarantees an opportunity for effective cross-examination, not
2  cross-examination to whatever extent the defense might wish).

3      The state court's finding that the competency reports were not relevant to
4  Makinano's reliability with respect to events that occurred in July 2007 also compel
5  denial of Petitioner's Compulsory Process and due process claims.  Both the Compulsory
6  Process Clause and the Due Process clause have a materiality requirement.

7      The Compulsory Process Clause compels production of evidence needed either by
8  the prosecution or by the defense. *United States v. Nixon*, 418 U.S. 683, 709 (1974).
9  However, the right to compulsory process is not absolute, *see Taylor v. Illinois*, 484 U.S.
10 400, 410 (1988), and applies only to testimony that is both material and favorable to the
11 defense, *see United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 873 (1982).  As
12 discussed *supra*, there is nothing in the record to suggest that the competency reports
13 were either relevant or favorable to Makinano's reliability with respect to his ability to
14 recall events that occurred in July 2007.  Accordingly, the Compulsory Clause claim is
15 denied. *See, e.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 509 (9th Cir. 1994) (no 6th
16 Amendment compulsory process violation where defendant failed to make showing that
17 he was deprived of testimony both material and relevant to his defense).

18     The Due Process Clause of the Fourteenth Amendment guarantees a fair trial, *see*
19 *Strickland v. Washington*, 466 U.S. 668, 684–85 (1984), and therefore guarantees
20 criminal defendants a meaningful opportunity to present a complete defense, *Crane v.*
21 *Kentucky*, 476 U.S. 683, 690–91 (1986).  However, there is no clearly established federal
22 law that requires courts or the prosecution to disclose evidence after they have determined
23 that the disclosure of the evidence is not necessary to ensure a fair trial.  Moreover, the
24 402 hearing established that Makinano was both competent to testify and accurately
25 perceived and recalled events from the relevant time period.  There is nothing in the
26 record that indicates that the state court's conclusion that the competency reports were not
27 relevant was an unreasonable determination of the facts.  Accordingly, the due process
28 claim is denied.

1              b.       Limitation on Cross-Examination of Makinano

2          Petitioner argues that the trial court's refusal to allow Petitioner to cross-examine

3   Makinano about Makinano's methamphetamine-induced hallucinations during the

4   summer of 2007 violated his rights under the Confrontation Clause.  In the competency

5   hearing, Makinano testified that during the summer of 2007, his use of methamphetamine

6   caused him to hallucinate.  RT 405–06.  He acknowledged that his methamphetamine use

7   caused him to forget some events but from that time period.  *Id.* at 414.  However, he

8   emphasized multiple times that the hallucinations did not cause him to perceive events

9   inaccurately.  *Id.* at 410, 412, 415.  The state court's conclusion that the hallucinations

10  were not relevant was not an unreasonable determination of the facts.

11         Moreover, Petitioner had the latitude to effectively cross-examine Makinano.  As

12  the state appellate court pointed out, Petitioner was not precluded from questioning

13  Makinano about his drug use and about his later interview with the police, both of which

14  would be relevant to Makinano's credibility.  Accordingly, the state court reasonably

15  applied clearly established federal law when it found that the trial court's limitation on

16  Petitioner's cross-examination of Makinano did not violate the Confrontation Clause.  *See*

17  *Ritchie*, 480 U.S. at 53 (Confrontation Clause only guarantees an opportunity for effective

18  cross-examination, not cross-examination to whatever extent the defense might wish).

19         3.      Error in Admitting Rudkin's Preliminary Hearing Testimony

20         Dorothy Rudkin, also known as Dorry, testified at the preliminary hearing that, on

21  the morning of the murder, Petitioner called her and asked to stay at her place and told her

22  that the police were looking for him.  Despite being specifically instructed by the trial

23  court at the preliminary hearing that she must appear for trial, Rudkin failed to appear.

24  Petitioner argues that the trial court prejudicially erred in finding Rudkin unavailable and

25  in admitting her preliminary hearing testimony, thereby violating his Sixth Amendment

26  right to confrontation.  Petitioner claims that if Rudkin's testimony had been excluded,

27  there would be no credible testimony linking Petitioner to the murder or undercutting the

28  argument that Petitioner was just along for the ride, and that therefore the jury would not

1  have found that Petitioner was guilty of first-degree murder.  Specifically, Petitioner

2  argues that only three witnesses gave testimony that connected Petitioner to the murder:

3  Washburn, Dominguez, and Rudkin.  Petitioner argues that in finding not true the

4  allegation that Petitioner personally used a firearm, the jury indicated that it did not find

5  the testimonies of Washburn or Dominguez credible.  He also claims that the prosecution

6  used Rudkin's testimony to refute defense counsel's argument that Petitioner was "just

7  along for the ride" and not an active participant in the murder.

8       The state appellate court rejected Petitioner's claim as follows:

9       III. Admission of Preliminary Hearing Testimony of Dorothy Rudkin

10      A. Relevant Facts
        Defendant's trial started on February 5, 2009. After the prosecutor served Dorothy

11      Rudkin with a subpoena to appear at the trial, the witness was arrested. On
        February 11, after the trial was adjourned for the day, Rudkin was brought into

12      court while she was in custody. The prosecutor asked the court to order Rudkin
        back to court on February 24, if she was released from custody or posted bail. The

13      court granted the prosecutor's request, telling the witness: "Ms. Rudkin, you're
        ordered to appear here, in case you bail, on February 24th at 8:30. That's a court

14      order. You don't need a further subpoena for that. And any failure to appear will
        result in a bench warrant. You understand?" Rudkin replied, "Yes." Rudkin then

15      said, "after this county" she had to go to "Santa Rita" county, and then corrected
        herself, and said she meant "Alameda County." The prosecutor indicated she

16      would work with Rudkin's attorney.

17      On February 24, Rudkin failed to appear as previously ordered by the court. The
        prosecutor reported that Rudkin's Contra Costa County case had been dismissed

18      and she was no longer in custody. The prosecution's investigator testified that
        Rudkin had posted bail on February 19, and had been released from Contra Costa

19      county jail. At the court's request, the prosecution's investigator contacted the
        Santa Rita jail classification deputy, who confirmed that Rudkin was not in

20      custody in the Santa Rita jail in Alameda County.

21      The prosecutor requested permission to read Rudkin's preliminary hearing
        testimony into the record on the grounds she had testified at the hearing, she had

22      not appeared as ordered by the court, and the prosecution had made attempts to
        locate the witness but she was not in custody. Defense counsel objected,

23      contending the prosecutor had not taken sufficient steps to locate Rudkin as the
        trial was still ongoing and there was still time to locate her. Defense counsel noted

24      the prosecution had contact information through friends, family, or the witness
        herself, and the witness's release from custody was insufficient to show that she

25      was unavailable.

26      The court overruled the defense objection: "Normally I would agree with you. If
        she had not been present before me and I had not ordered her back personally, I

27      would agree with you the showing would be insufficient at this point. However, I
        personally ordered her to be here ... at 8:30.[¶] And she indicated that she

28      understood. And in fact, the information came from her that she thought she might

1    have a warrant and would be transported to Santa Rita which is why I even asked the question. [¶] But since she's not in custody here and she's not in custody in Santa Rita, she is in disregard of the court order. I am going to issue a bench warrant for her arrest. I am going to allow the preliminary hearing testimony to be read."

2

3

4    B. Analysis

5    The parties present extensive arguments regarding the propriety of the admission of Rudkin's preliminary hearing testimony on the basis of the witness's unavailability. However, we do not need to address and express no opinion on the court's ruling in response to the parties' arguments during the trial. As we now discuss, even if the evidence should have been excluded, we conclude its admission was harmless under any standard of review. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

6

7

8

9    Contrary to defendant's contention, Rudkin was not a crucial prosecution witness. The substantive portion of her testimony—defendant's statement that the cops were looking for him—was independently before the jury through Dominquez's testimony that defendant discussed fleeing because it was believed he was involved in the murder. Additionally, we see no basis for defendant's assertion that Rudkin was a "credible witness." As argued by defense counsel in his closing, Rudkin's credibility was undermined by her regular use of methamphetamine at the time she received the telephone call from defendant and when she later discussed the matter with the police. Rudkin's criminal history, her reasons for talking to the police, and "[t]he fact [she] did not appear as a witness [at trial] may have further undermined [her] credibility in the eyes of the jury." (*People v. Pitts* (1990) 223 Cal.App.3d 1547, 1557.) The prosecutor's reference in her closing statement to Rudkin's testimony does not demonstrate the importance of the testimony, as defendant suggests. The prosecutor's rebuttal remark reminding the jury of Rudkin's testimony was nothing more than a reasonable response to defense counsel's closing arguments as to how the jury should consider the witness's testimony. We therefore conclude defendant has not demonstrated that the admission of Rudkin's preliminary hearing testimony was prejudicial error requiring reversal.

10

11

12

13

14

15

16

17

18 Op. at 24–26.

19

20      The Supreme Court has held that preliminary hearing testimony is admissible if the

21 defendant had an adequate opportunity to cross-examine the witness and the government

22 had established the unavailability of the witness. *Crawford*, 541 U.S. at 57; *see also*

23 *Barber v. Page*, 390 U.S. 719, 722 (1968) (". . . there has traditionally been an exception

24 to the confrontation requirement where a witness is unavailable and has given testimony

25 at previous judicial proceedings against the same defendant which was subject to cross-

26 examination by that defendant."). Here, Petitioner had ample opportunity to cross-

27 examine Rudkin. Defense counsel cross-examined Rudkin regarding her relationships

28 with Petitioner, Agredano, and the victim; her knowledge of the relationships between

1   Petitioner and the victim; her drug use during the relevant time period; and her ability to

2   recall the events she discussed in her police statement. RT 798–805. Thus, the only issue

3   before this Court is whether Rudkin was unavailable. On direct review, the state

4   appellate court did not analyze whether Rudkin was properly considered unavailable but

5   proceeded directly to determining whether the alleged error was prejudicial error

6   requiring reversal. Accordingly, the Court will follow the same approach.[3]

7          On federal habeas review, the standard for determining reversible error is whether

8   the error had a "'substantial and injurious effect or influence in determining the jury's

9   verdict.'" *Brecht*, 507 U.S. at 637 (internal quotation marks and citation omitted).

10  Applying the *Brecht* harmless error standard, the Court is convinced that there was no

11  error in admitting Rudkin's testimony. Contrary to Petitioner's allegations, the not-true

12  finding on the special allegation that he personally used a firearm does not conclusively

13  establish that the jury discredited the entirety of Washburn's and Dominguez's

14  testimonies, including the portions unrelated to whether Petitioner shot the victim. The

15  not-true finding on the special allegation could also indicate that the jury was unable to

16  agree as to whether Agredano or Petitioner shot the victim, or that the jury found that the

17  prosecution had not met its burden of proving beyond a reasonable doubt that Petitioner

18  used the firearm in committing the crime. Rudkin was therefore not the only witness who

19  connected Petitioner to the crime.

20

21

22

----

23         [3]Although the Court declines to determine whether the trial court erred in determining that Rudkin was unavailable, the Court notes that the Supreme Court has held that the Sixth

24  Amendment "does not require the prosecution to exhaust every avenue of inquiry" into obtaining the witness' presence. *Hardy*, 132 S. Ct. at 495 (finding that state court reasonably concluded

25  that prosecution had made reasonable effort to procure attendance of witness when repeated visits were made to her last known address, relatives were questioned, and records were

26  consulted). The *Hardy* Court also emphasized that "the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the

27  question of unavailability merely because the federal court identifies additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be

28  disturbed." *Id.*

1    Even if it had been error to admit Rudkin's testimony, the error did not have a

2   substantial or injurious effect or influence in determining the jury's verdict. *Brecht*, 507

3   U.S. at 637. Respondent correctly points out that Rudkin's testimony was both minimal

4   and cumulative of other testimony. Rudkin's testimony was minimal; she only testified to

5   telling the detectives that on the morning of the murder, she received a phone call from

6   Petitioner asking if he could come "kick it with her" because the Contra Costa County

7   police were looking for him. RT 797–98 and 803. Phone records showed that she

8   received a call from Petitioner at 3:49 a.m. the morning of the murder. *Id.* at 840. She

9   denied recalling receiving the phone call. *Id.* at 803. As the state appellate court noted,

10  Rudki's preliminary hearing testimony was duplicative of Dominguez's trial testimony.

11  Dominguez testified that Petitioner had informed her that he was in trouble and would

12  need to go on the run and was considering fleeing to Mexico. *Id.* at 784–86. Finally, as

13  the state appellate court noted, Petitioner overstates the importance of Rudkin's

14  testimony. Her credibility had been undermined by her admission of regular

15  methamphetamine use and her inability to remember the call. In addition, Petitioner's

16  argument that the prosecution's reference to Rudkin's testimony in its rebuttal remark

17  indicated that Rudkin's testimony was critical to the guilty verdict relies upon Petitioner's

18  unsupported assumption that the jury had discredited Dominguez's and Washburn's

19  testimony about Petitioner's actions following the victim's murder.

20    The state court's denial of this claim was neither an unreasonable application of

21  clearly established federal law nor an unreasonable application of the law.

22    4.   Cumulative Error

23    Petitioner argues that even if each of the above individual errors was harmless, the

24  combination of the instructional and evidentiary errors prejudiced him in the following

25  way: the jury instructions allowed Petitioner to be convicted based on the mental state of

26  a co-participant rather than his own mental state; and the erroneously admitted testimony

27  of Makinano and Rudkin bolstered evidence that he and Agredano were "equally guilty."

28  Docket No. 1 at 68–69. The state appellate court rejected Petitioner's claims as follows:

1   We reject defendant's contention that reversal is required based on the cumulative
2   effect of the purported errors raised on appeal. "[A] series of trial errors, though
    independently harmless, may in some circumstances rise by accretion to the level
3   of reversible and prejudicial error. [Citations.]" (*People v. Hill* (1998) 17 Cal.4th
    800, 844–845.) This is not such a case. The record demonstrates that any purported
4   errors, considered individually or collectively, were not so prejudicial as to deny
    defendant a fair trial or a reliable verdict.

5   Op. at 26.

6   In some cases, although no single trial error is sufficiently prejudicial to warrant

7   reversal, the cumulative effect of several errors may still prejudice a defendant so much

8   that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th

9   Cir. 2003). Cumulative error is more likely to be found prejudicial when the

10  government's case is weak. *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.

11  1996). Where there is no single constitutional error existing, nothing can accumulate to

12  the level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011);

13  *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Similarly, there can be no

14  cumulative error when there has not been more than one error. *United States v. Solorio*,

15  669 F.3d 943, 956 (9th Cir. 2012). Here, this Court has not found multiple constitutional

16  errors that would warrant habeas relief. Nor was this a case where the government's case

17  was weak. There was evidence that Petitioner believed that the victim needed to be dealt

18  with; that immediately prior to the murder Petitioner stopped to pick up a shotgun; that

19  the victim was killed by a shotgun; that Petitioner was present at the murder; and that

20  Petitioner was attempting to hide from the police shortly after the murder. The jury

21  instructions clearly set forth the elements needed to find first degree murder. The jury

22  was able to assess the credibility of the evidence and ultimately found Petitioner guilty of

23  first degree murder. Accordingly, the Court finds that the state court's denial of this

24  claim of cumulative error was neither an unreasonable application of clearly established

25  federal law, nor was it an unreasonable determination of the law.

**CONCLUSION**

27  For the reasons set forth above, the petition for writ of habeas corpus is **DENIED**.

28  Accordingly, Petitioner's requests for appointment of counsel and for an evidentiary

1   hearing (Docket No. 1 at 71) are also DENIED.  The federal rules governing habeas cases

2   brought by state prisoners require a district court that denies a habeas petition to grant or

3   deny a certificate of appealability ("COA") in its ruling.  *See* Rule 11(a), Rules Governing

4   § 2254 Cases, 28 U.S.C. foll. § 2254.  Petitioner has not shown "that jurists of reason

5   would find it debatable whether the petition states a valid claim of the denial of a

6   constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a COA

7   is **DENIED**.

8        The Clerk shall close the file.

9        **IT IS SO ORDERED.**

10  DATED: May 4, 2015

11                                    BETH LABSON FREEMAN
                                      United States District Judge